UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

RICHARD GOETTLE, INC.        :

        Plaintiff        :

                                :      Civil Action No. 06-1433
                                              (EGS)

JEFFERSON AT PENN QUARTER, L.P. :   AFFIDAVIT OF BRIAN HECK

                                              IN OPPOSITION TO MOTION

       Defendant        :      FOR SUMMARY JUDGMENT

STATE OF Louisiana
PARISH OF St. Mary          SS)

     Brian Heck, being first duly sworn, states:

1.    He has personal knowledge of the matters set forth in this affidavit.

2.    He is an employee of Plaintiff.

3.    At the times in question in the complaint filed herein he was an employee of Plaintiff and was Plaintiff's Project Manager in charge of the Jefferson at Penn Quarter Project, 616 E. St., NW, Washington, DC (the "Project").

4.    Paragraph 13 of Plaintiff's written subcontract with J.A. Jones/Tompkins Builders, Inc. ("Tompkins") required Plaintiff to hold Defendant harmless with regards to any damages which Plaintiff's Work on the Project might cause to the adjacent building owned by the International Order of Odd Follows ("IOOF"). A copy of the pertinent page from such Subcontract is attached hereto and made a part hereof as Exhibit A.

5.    IOOF made a claim against Defendant alleging that the Work of Plaintiff on the Project caused damage to the adjacent building owned by the IOOF.

4.    In light of its obligation under the above-mentioned written subcontract Plaintiff retained E. J. Construction Engineering ("E.J. Construction"), as a second-tier subcontractor to provide services and material with regard to the repair such damage to

the IOOF building on behalf of Plaintiff. A copy of such subcontract with E.J. Construction is attached hereto and made a part hereof as Exhibit B.

6. Pursuant to its subcontract with Plaintiff E. J. Construction performed services and provided materials with regard to the repair such damage to the IOOF building on behalf of Plaintiff up to and including July, 2004.

7. Plaintiff's subcontract with Tompkins expressly provides in Paragraph 1 of Exhibit A thereto that the claims of Plaintiff against Defendant for delay damages were expressly reserved to Plaintiff against Defendant. A copy of such Paragraph is attached hereto and made a part hereof as Exhibit C.

8. From the monies owed to Plaintiff for services and materials it provided to the Project Tompkins withheld from Plaintiff retainage equal to 10% of the amount owed to Plaintiff for same for a total retainage withheld of $196,950.00. In turn Defendant withheld from Tompkins as retainage the $196,950.00 which Tompkins owed to Goettle for such services and materials provided to the Project.

9. Tompkins never paid Plaintiff said $196,950.00 and Defendant never paid Tompkins the $196,950.00 that was retained from Tompkins for the Work performed by Plaintiff on the Project.

10. As Plaintiff's subcontract with Tompkins provided that such retainage was not due from Tompkins until after Tompkins received payment thereof from the Defendant, such monies were not yet due and payable to Plaintiff from Tompkins.

11. When Defendant terminated Tompkins as the general contractor on the Project effective August 21, 2003, Plaintiff made demand upon Defendant for the payment of the $196,950.00 in retainage that had been withheld from Plaintiff.

12. Defendant advised him that it would not know what amount was payable to Plaintiff until after the claim of the IOOF for the property damage to its building allegedly caused by Plaintiff was resolved.

13. Such claim of the IOOF has not yet been resolved and is still in litigation at this time.

14. Plaintiff continued to provide services to the Project through its subcontractor E.J. Construction until the first week of July, 2004.

Further Affiant sayeth naught.

_____
Brian Heck

Sworn to and subscribed before me, a notary public in said parish and state, on this 12th day of September, 2006.

_____
Notary Public

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing affidavit was served upon Jeffrey G. Gilmore, Attorney for Defendant, Akerman Senterfitt, Wickwire Gavin, 8100 Boone Blvd., Suite 700, Vienna, Virginia 22182, on this 14th day of September, 2006.

_____
Stephen A. Horvath
Attorney for Plaintiff

# J.A. Jones/Tompkins Builders, Inc.

| Date | | Subcontract No. |
|---|---|---|
| 10/12/2001 | | 21066-004 |

## SUBCONTRACT

Address: 1333 H Street N.W., Suite 200  Washington, DC 20005

| SUBCONTRACTOR: | Richard Goettle, Inc | CONTACT: | Douglas Keller |
|---|---|---|---|
| | 12071 Hamilton Ave. | PHONE: | (513) 825-8100 |
| | | FAX: | (513) 825-8107 |
| | Cincinnati, OH 45231 | | |

| Vendor No: | 08318 | VC No: | 10b |
|---|---|---|---|

SUBCONTRACT FOR: Sheeting, Shoring, Underpinning                                (general caption only)

ACCOUNT CODE: 02-4000-000-40

PROJECT:        Jefferson at Penn Quarter

LOCATION:   616 E St., NW
                        Washington, DC

OWNER: Jefferson at Penn Quarter, L.P. c/o JPI

ARCHITECT/ENGINEER: Esocoff & Associates

GENERAL CONTRACT: 8/29/2001

SUBCONTRACT PRICE:   One million nine hundred sixty-nine                    ($1,969,500.00)
                                            thousand five hundred dollars

PROGRESS ESTIMATE DATE: On or before the 20th of each month

RETAINAGE PERCENTAGE:   10%

Payment and Performance Bond Required
Bond Premium:                                          [x] Included in Price      [ ] Not included in Price

---

(The foregoing terms are incorporated into and more fully explained in the provisions that follow.)

J.A. Jones/Tompkins Builders, Inc., a District of Columbia Corporation, with its principal offices in Washington, DC, "Contractor", and Richard Goettle, Inc, a(n) , with offices at the above address, and with its principal offices in , "Subcontractor", agree as follows:

-1-

**EXHIBIT A**

Subcontractor shall cooperate with, and shall not delay, impede, or otherwise impair the work of others participating in the construction of the Project.

If Subcontractor is damaged by the act of the Owner or other occurrence, for which act or occurrence the Contract affords benefits and remedies solely to Contractor, then Subcontractor shall be derivatively entitled to the benefits to be achieved by the pursuit of such remedies, as Subcontractor's interest may appear; provided, however, Contractor shall not be required to file any claim or take any action against Owner on behalf of Subcontractor unless Subcontractor shall provide adequately for the payment of, and shall pay for, all costs and expenses, including attorney's fees, that may be incurred by Contractor in proportion to the amount of Subcontractor claim, in the pursuit of such remedies. Contractor shall not be required on behalf of Subcontractor to file any claim or take any action against any person other than Owner; nor to file any claim or take any action against any party whatsoever (including the Owner) that is not asserted in good faith or that would unreasonably extend the date for a substantial final payment under the Contract. It is agreed that the claim of Subcontractor against Contractor for the acts of the Owner is limited to the rights of Contractor against Owner and when such rights have been exhausted, Subcontractor's claim is settled.

11. <u>Assignment</u>. Subcontractor shall not assign, transfer, or otherwise dispose of this Subcontract or any part thereof including all or any portion of the Work, nor assign any monies due or to become due hereunder, except with the prior written consent of Contractor. Any assignment of this Subcontract consented to by Contractor shall not operate to relieve Subcontractor of its primary responsibility to Contractor for the due and full performance hereof, and Subcontractor shall be liable to Contractor for all acts and omissions of Subcontractor's subcontractors and assignees.

Any assignment of this Subcontract or monies under it without the prior written consent of Contractor will be void and of no effect.

12. <u>Bonds</u>. Unless otherwise indicated on Page 1 hereof, Subcontractor, at its own expense, shall obtain from a commercial surety acceptable to Contractor separate bonds: a) for the due and complete performance of Subcontractor's obligations hereunder (performance bond), and b) for the timely payment of all charges for labor, services, and materials furnished for the prosecution of the Work (payment bond). Each such bond shall be for a penal sum equal to one hundred percent (100%) of the Subcontract Price; shall be provided by a surety licensed in the appropriate jurisdiction where the Work is to be performed and listed in the current US Department of Treasury Circular 570 with an underwriting limitation specified therein consistent with the face amount of the bonds; shall be executed on forms provided by and in a manner satisfactory to Contractor; and shall be delivered to Contractor within seven (7) days after the execution hereof. If, in accordance with the indication on Page 1 hereof, the premium expense for such bonds is not included in the Subcontract Price, then Subcontractor shall submit to Contractor the actual surety's invoice for such bonds. Upon presentation of satisfactory bonds, Contractor shall pay the lesser of either the invoice amount or other such bond premium amount as may be stated elsewhere in this Subcontract. At Contractor's option, such payment may be made to Subcontractor or directly to the surety.

If, according to the foregoing provisions, Subcontractor is not required to furnish such bonds, Subcontractor shall submit to Contractor a current financial statement; and Contractor reserves the right at any time to require Subcontractor to furnish such bonds, but at Contractor's expense. If Subcontractor fails at any time to obtain and furnish a bond, such failure will constitute a material breach by Subcontractor, entitling Contractor to proceed under the provisions of Article 23, Default, hereof.

13. <u>Indemnity</u>. Subcontractor agrees to defend, indemnify and hold harmless Contractor and Owner and their agents and employees, from and against any claim, cost, expense or liability (including attorneys' fees) attributable to bodily injury, sickness, disease or death, or damage, loss or destruction of property (including loss of use thereof), caused by, arising out of, resulting from or occurring in connection with the performance of the Work by Subcontractor, its subcontractors, or their agents or employees, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided, however, Subcontractor's duty hereunder shall not arise if such injury, sickness, disease, death, damage or destruction is caused by the sole negligence of a party indemnified hereunder. Subcontractor's obligation hereunder shall not be limited by the provisions of any workmen's compensation or similar act, or by the provisions, scope or limitations of any insurance requirements or coverage.

5

Should Owner or any other person assert a claim or institute a suit, action, or proceeding against Contractor involving the manner or sufficiency of the performance of the Work, Subcontractor shall, upon request of Contractor, promptly assume the defense of such claim, suit, action or proceeding, at Subcontractor's expense, and Subcontractor shall indemnify and hold harmless Contractor and its agents and employees, from and against any liability, loss, damage, or expense arising out of or related to such claim, suit, action or proceeding.

Subcontractor agrees to reimburse Contractor for all costs (including attorney's fees) incurred by Contractor in enforcing or securing Subcontractor's performance of any of the provisions of this Subcontract including this Article 13.

14. **Insurance.** Subcontractor shall maintain and pay for insurance coverage of the types and with the minimum limits set forth in Schedule D attached hereto. Such coverage shall be maintained in form and with companies acceptable to Contractor, Architect, and Owner, and shall, notwithstanding Schedule D, meet the applicable requirements imposed under the Contract or by any governmental authority having jurisdiction over the Work. If Subcontractor fails at any time to secure and maintain any insurance coverage required hereunder, such failure will constitute a material breach by Subcontractor, entitling Contractor to proceed under the provisions of Article 23, Default, hereof. Subcontractor shall furnish Contractor certificates of the insurance required hereunder and each policy of insurance shall provide for thirty (30) days notice to Contractor prior to cancellation. Contractor may at any time require Subcontractor to reaffirm the maintenance of such coverage.

Subcontractor shall determine the adequacy, scope, limits, terms and applicability to Subcontractor's Work of any builder's risk or fire insurance, if any, which may be provided or maintained by Contractor or Owner. Subcontractor shall be responsible for providing any such insurance or supplemental insurance it may desire. In the event of a loss for which an Owner's or Contractor's builder's risk or fire insurance policy, if any, provides coverage for Subcontractor's Work, and a recovery from such insurance is subsequently secured, Contractor or Owner shall have sole responsibility and discretion for the allocation of such recovery. The initiation or pendency of a claim or recovery under such insurance, if any, shall not be cause for Subcontractor to delay or suspend the performance of any obligation under this Subcontract. Except when and to the extent specifically covered by such insurance, if any, which the Owner or Contractor may maintain, Subcontractor shall be responsible for any desired coverage against damage or loss to its own material, facilities, tools, equipment, plant, scaffolds, bracing, and similar items.

Subcontractor shall furnish Contractor a copy of each lost time accident report made to Subcontractor's insurance carriers and shall cooperate with insurers to facilitate the adjustment of any claim or demand arising out of operations within the scope of the Work. To the extent that Subcontractor maintains insurance coverage, Subcontractor hereby waives subrogation of claims against Contractor, Owner, and their agents or employees. Nothing contained in this Article 14 shall relieve the Subcontractor of any indemnity obligations required elsewhere in the Subcontract.

15. **Safety and Security.** Subcontractor shall execute the Work under this Subcontract in a prudent, cautious and safe manner; continuously maintain a safe and secure workplace; employ at all times whatever means may be reasonably required to insure the safety and avoid the endangerment of all persons and property of itself and others; and comply with any specific safety and security-related requirements of the Owner, the Contract or the Contract Documents.

Subcontractor represents that, for the purposes of the Occupational Safety and Health Act (OSHA) of 1970 (including any state counterparts in those states authorized to enforce OSHA laws) and including all standards and regulations which have been or shall be promulgated by the governmental authorities which administer such Act, it is an 'employer' under the definition contained in such Act and, as an employer, is obligated to observe the requirements of that Act independent of any contractual relationship; and that, with respect to the Work and all activities associated in any manner with the Work or the Project, it will so comply with the requirements of that Act and all other requirements, standards, orders, regulations, or ordinances issued by any authority having jurisdiction over the Work.

Subcontractor shall observe and comply with all laws and regulations relating to the shipment, possession, handling, labeling, packaging, storage, use, exposure, discharge, and disposal of any hazardous substance including any laws and regulations relating to record-keeping and publication, posting or communication of hazard information.

Subcontractor shall observe and comply with all environmental protection laws and regulations applicable

6

IN WITNESS WHEREOF, the parties have duly executed this Subcontract, in one or more copies or counterpart originals, as of the date set forth on Page 1 hereof.

ATTEST:

_____

ATTEST:

_____

J.A. Jones/Tompkins Builders, Inc.
Contractor

By: _____
Title:

**Richard Goettle, Inc**
Subcontractor

By: _Terrence N. Tucker_
Title: _President_

## INDEX

This Subcontract consists of the following:

| | |
|---|---|
| Subcontract General Provisions | Pages 1-11 |
| Schedule A, Scope of Work | Page(s) 2 |
| Schedule B, Contract Documents | Page(s) 7 |
| Schedule C, Prices | Page(s) 1 |
| Schedule D, Insurance Requirements | Page(s) 1 |
| Schedule E, Special Provisions | Page(s) 1 |
| Schedule F, Supplementary Provisions | Page(s) 5 |
| Schedule G, EEO | Page(s) 1 |

-11-

Subcontract No 21066 - 004

## JEFFERSON AT PENN QUARTERS
## SCOPE OF WORK – SHEETING AND SHORING

The Work includes, but is not limited to the following, which is provided as a general guide and is not intended to represent each and every item necessary to perform the work. It is the Subcontractor's responsibility to provide a complete Scope of Work.

The Subcontractor will furnish labor, material, equipment, plant, and services necessary to furnish and install all <u>Sheeting, Shoring</u> and related work in accordance with the agreement between the Owner and Contractor, Project Drawings and Specifications as listed in Schedule B as prepared by Esocoff & Associates / Architects., with specific reference to following:

> Division 0 – Bidding & Contracting Requirements
> Division 1– General Requirements-
> Specification Sections:
> 02250 – Shoring and Bracing
> 02255 – Underpinning
> 02290 - Site Monitoring

1. It is understood that this Subcontractor has prepared the sheeting & shoring shop drawings under the authority of a Letter of Intent dated January 11, 2001 issued by the Owner. The Building Permit for the sheeting & shoring work from the District of Columbia has been issued based on the most recent shop drawings, which include Revision No. 4 dated August 15, 2001, and a copy of the permit has been provided to the Subcontractor. The Subcontractor maintains that certain conditions relative to the sheeting & shoring work exist at this time, which were not apparent to the Subcontractor during the shop drawing preparation and schedule planning phases. These conditions include requirements for underpinning and for construction work during winter months. The Subcontractor believes that these conditions may entitle them to additional compensation over and above the Subcontract amount stipulated in the Owners Letter of Intent. This Subcontract agreement recognizes the rights of the Subcontractor to pursue a claim for such costs with the Owner, however, it is specifically understood that the Contractor will have no responsibility whatsoever to the Subcontractor for any part of such claims that may be rejected by the Owner. *provided the contractor provides a vehicle to the owner through their contractual privity.*

2. Pumping and de-watering of rainwater required to keep the work areas clear of water during the work of this agreement.

3. Subcontractor may use the earth ramps provided by the Excavator, ~~as they are~~ *and they will be* available, for site access for material, equipment, and personnel. Access other than the earth ramps ~~will be~~ *are not envisioned* by this Subcontractor. *Access and availability to be coordinated*

4. Provide underpinning work for the Clara Barton Building and the grade beams for the Gallery Row buildings as required.

Subcontract No. 21066-004

SCHEDULE A
Page 1 of 2

INITIAL

EXHIBIT C

5. Install angle iron and safety cables at the perimeter of the site, at street grade level, to act as a safety fence at all perimeter locations that do not abut to existing buildings that are to remain. Angle iron and safety cables to be removed at completion by Contractor.

6. This Subcontractor acknowledges that the performance of the work requires cooperation as well as close coordination of sheeting and shoring activities, in a mutually agreeable program as established by the Contractor, with other foundation related work so that the individual trades are not disrupted or delayed by each other. This includes, but is not limited to, Excavation, Demolition, Dewatering, Cast-In-Place Concrete, and Façade Bracing work.

7. At the conclusion of work of this agreement, Subcontractor shall leave the Site Monitoring System in place for use by others.

8. Schedule:
    a. Mobilize within four (4) weeks after Notice to Proceed.
    b. Complete all work.............................. 16 weeks

9. The following clarifications are a part of this Subcontract:
    a. Temporary utilities and related consumption fees will be by others.
    b. This Subcontract excludes the underground obstructions as referenced in the Subcontractors letter to the Owner dated December 19, 2000.
    c. Spoils handling and removal is by others.
    d. Surveying and layout of Subcontractors work is included herein, from initial survey control points on the site, to be established by other.
    e. Removal of angle iron and safety rail/cables at completion of Work by Contractor.

10. Item 2 Subparagraphs a+b of Richard Griffith Letter of October 15, 2001 are made a part of this Subcontract agreement.  *JNT*





August 28, 2002

E.J. Construction Engineering
421 Church St. N.E.
Suite F
Vienna, VA 22180

Attn:       Edward J. Jones, P.E.

Re:         Jefferson @ Penn Quarter
            Earth Retention System

Subj:       **Construction Management Services**
            **Remedial Work/IOOF Building**

Dear Ed:

Enclosed is an executed copy of your letter dated August 28, 2002, transmitting your fee schedule for performing a physical feature surveys as required well as performing construction management services on behalf of Richard Goettle, Inc. and The St. Paul Insurance Company

It is envisioned that the scope of your services will include, but not necessarily be limited to the following:

- Perform detailed surveys as required which will document physical features such as cracks and building or slab movements which may have resulted from our shoring work.

- Continue to monitor building movement as required.

- Attend meetings with or on Goettle's behalf.

- Solicit competitive prices from appropriate craft contractors to perform the repair work.

- Develop a schedule for making the repairs and coordinate all remedial work with the IOOF, JPI and Tompkins as required.

As discussed with Randy LaFever with The St. Paul Companies, please remit a descriptive invoice through the end of August for all work associated with performing the



EXHIBIT B

RICHARD GOETTLE, INC.                                        THE GOETTLE COMPANY
12071 HAMILTON AVE. • CINCINNATI, OHIO 45231 • (513) 825-8100 • FAX (513) 825-8107

E.J. Construction Engineering
Construction Management Services
Remedial Work/IOOF Building
August 28, 2002
Page 2

existing condition survey. Starting September 1, 2002, please provide Goettle's project manager, Mr. Brian Heck, with a weekly overview of activities relative to this issue. Please send your invoice directly to Mr. LaFever at the end of each month and a copy to Brian Heck.

We appreciate your efforts to date and both Goettle and St. Paul acknowledge that your upfront and honest approach while dealing with the IOOF and their consultants will allow for a cost effective means of managing the remedial work and issues as they arise.

If you should encounter anything unexpected or conditions not symptomatic of movement resulting from our work, please contact St. Paul and Goettle prior to formally documenting those issues.

If you should have any questions or require additional information, please contact us.

Sincerely,

**RICHARD GOETTLE, INC.**

Terry Tucker
President

/bt

cc:   Randy LaFever, The St. Paul Co.
      Larry Rayburn, Goettle
      Rick Slack, Goettle
      Brian Heck, Goettle

# EJ CONSTRUCTION ENGINEERING

421 Church Street, N.E., Suite F
Vienna, VA  22180
Phone: 703/242-9260
Fax: 703/242-9263
ejce.@mindspring.com


PROPOSAL TO:   Richard Goettle, Inc.
               Terry Tucker, President
               12071 Hamilton Avenue
               Cincinnati, Ohio  45231

RE:            Jefferson At Penn Quarter

SUBJECT:       Construction Management

DATE:          August 28, 2002


By your request, E.J. Construction Engineering (EJCE) will provide construction management services for repairs at the IOOF building. Scope of repairs will be as agreed by Richard Goettle, Inc. and IOOF.

Construction management services will be provided based on the enclosed fee schedule.

Respectfully submitted,

E.J. CONSTRUCTION ENGINEERING

*[signature]*
Edward J. Jones, P.E.
President

Enc.
  Fee Schedule


Accepted by:  _____*[signature]*_____  _____President_____
                     Name                              Title
              _____8/28/02_____
                     Date

# EJ CONSTRUCTION ENGINEERING

421 Church Street, N.E., Suite F
Vienna, VA 22180
Phone: 703/242-9260
Fax: 703/242-9263
ejce.@mindspring.com

## Consulting Services Fee Schedule

|  | Consulting: (per hour) | Testimony: (per hour) |
|---|---|---|
| **Consultant/Engineer:** |  |  |
| Principal (Licensed Professional Engineer) | $150.00 | $225.00 |
| Project Manager (Licensed Professional Engineer) | $120.00 | $180.00 |
| Project Engineer (Civil/Structural Engineer) | $ 90.00 | $135.00 |
| Staff Engineer | $ 80.00 | $120.00 |
| Engineering Technician | $ 55.00 |  |
| **Support Personnel:** |  |  |
| Administrative Support | $ 50.00 |  |

(Consulting service fees consist of travel from the office to the site and return to the office.)

**Direct Project Expenses:**
Photography/Video Taping — At cost plus 20%
Reproduction
　CAD, blue prints, specifications and documents — Cost plus 20%

All Other Direct Job Expenses,
　Outside Consultants and Materials — @ Cost plus 20%

Cost for services and reimbursable expenses will be invoiced every 30 days. If CLIENT fails to make any payment due EJCE for services and expenses with 30 days after receipt of EJCE's Statement, the amounts due will be increased at the rate of 1.5% per month or maximum interest allowed by law, whichever is greater. CLIENT will also pay any cost of collection, including reasonable attorney's fees in the amount of 15% if invoices are collected by law or through an attorney at law.